**STATE of Missouri, Plaintiff/Respondent,**

v.

**Kevin L. PRESBERRY, Defendant/Appellant.**

**No. ED 81141.**

Missouri Court of Appeals, Eastern District, Division One.

Dec. 9, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 11, 2004.

Application for Transfer Denied March 30, 2004.

Rebecca Kurz, Assistant Appellate Defender, Kansas City, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrea Mazza Follett, Assistant Attorney General, Jefferson City, MO, for respondent.

MARY K. HOFF, Judge.

Kevin L. Presberry (Defendant) appeals from the trial court's judgment entered following a jury trial. The jury found Defendant guilty of the five charged offenses,[1] convicting Defendant of first degree robbery in violation of Section 569.020 RSMo 2000,[2] second degree robbery in violation of Section 569.030, fraudulent use of a credit device in violation of Section 570.130, attempted first degree robbery in violation of Section 564.011, and first degree tampering in the operation of a motor vehicle in violation of Section 569.080.1(2). Prior to sentencing, the trial court granted Defendant's motion for judgment of acquittal with respect to the second degree robbery offense, and denied that motion with respect to stealing a credit card in violation of Section 570.030.3(3)(c), which the trial court found was a lesser included offense of second degree robbery. The trial court otherwise denied Defendant's post-trial motions and sentenced Defendant to concurrent terms of twenty-five years for first degree robbery, seven years for stealing a credit card, five years for fraudulent use of a credit device, ten years for attempted first degree robbery, and five years for first degree tampering in the operation of a motor vehicle. We reverse the trial court's judgment regarding the

---

1. Before trial, the trial court had expressly found beyond a reasonable doubt that, as charged in Count VI of the amended information, Defendant was a prior offender under Section 558.016.2 RSMo 2000, based on his October 1997 plea of guilty to second degree robbery on November 28, 1996. Defendant does not challenge this finding on appeal.

2. Subsequent statutory citations are to RSMo 2000, unless otherwise noted.

stealing a credit card, attempted first degree robbery, and first degree tampering offenses; and reverse and remand the judgment with respect to the first degree robbery and fraudulent use of a credit device offenses.

### Background and Procedural History

Defendant was arrested on December 4, 2000, while driving a silver Tahoe near an Automated Teller Machine (ATM) on Fern Ridge. Contemporaneously with Defendant's arrest, the police also arrested William Tabb, who had been a passenger in the silver Tahoe, and was found near some bushes in the vicinity of the Fern Ridge ATM. The State charged Defendant with first degree robbery (Count I) and second degree robbery (Count II), respectively, in the robberies of Cynthia Bornhop (Bornhop) on November 11, 2000, and JungJoo Park (Park) on November 27, 2000, at the Fern Ridge ATM; and with fraudulent use of a credit device, specifically an ATM card, at a different ATM on November 28, 2000 (Count III). The State also charged Defendant with attempted first degree robbery at the Fern Ridge ATM (Count IV) and with first degree tampering in the operation of a motor vehicle, specifically a silver Tahoe, without the owner's consent (Count V), on December 4, 2000.

Neither Park nor Defendant testified at trial. The evidence presented at trial consisted of the testimony of: Bornhop; Officers Michael Youngblood, Thomas Taylor, and Brad Kelling, who were involved in the surveillance of the ATM and arrest of Defendant on December 4, 2000; Detective John Newsham and Officer Rich Muehlenbeck, who investigated the November incidents; Detective David Kopfensteiner, who made a composite of the suspect based on information from Bornhop; the general manager of Jim Butler Chevrolet, from which one or more Tahoes were taken in November 2000; the owner of the license plate found on the silver Tahoe; and two employees of the bank whose ATMs were the subject of the November and December incidents. Additionally, the State introduced the following exhibits during trial: a coat; two cellular phones; phone records pertaining to those two cellular phones; a pellet gun; a pair of binoculars; a black headband; an ATM withdrawal receipt; a photo lineup; a composite; photographs of Defendant taken in December 1998, May 1999, November 1999, and December 2000; a photograph of Tabb; three videotapes from the ATMs; various other photographs, including pictures of the Tahoe, of the ATMs, of an ATM deposit slip and deposit envelope, and pictures from recordings taken by the ATM video cameras during the November incidents; and documents indicating ATM card activity.

At the conclusion of trial, the jury found Defendant guilty of each of the charged offenses. Defendant then filed a motion for judgment of acquittal, or in the alternative, motion for new trial, as well as a pro se motion for new trial ("post-trial motions"). In part, Defendant asserted there was insufficient evidence on the charge of second degree robbery involving Park. The trial court granted Defendant's motion for judgment of acquittal as to the second degree robbery offense only. The trial court then found stealing a credit card was a lesser included offense of second degree robbery, and denied the motion for judgment of acquittal on the lesser included offense of stealing a credit card. In all other respects, the trial court denied Defendant's post-trial motions. This appeal followed the trial court's imposition of the concurrent sentences noted above and entry of judgment on the five offenses.

### Defendant's Points on Appeal

Defendant raises five points on appeal. First, Defendant asserts the trial court

plainly erred in permitting Officer Youngblood and Detective Newsham to testify that, in their opinions, the suspect in the videotapes and still photographs from the videotapes at the ATMs was Defendant, because that testimony invaded the province of the jury. Second, Defendant contends that, after sustaining his motion for judgment of acquittal on the second degree robbery offense, the trial court plainly erred in entering the judgment of conviction and sentencing Defendant for stealing a credit card, because the jury was not required to find each of the elements for that offense nor was there sufficient evidence for the jury to find each of those elements. Third, Defendant urges the trial court plainly erred by overruling Defendant's motion for judgment of acquittal and sentencing Defendant for attempted first degree robbery, because the State did not prove beyond a reasonable doubt that Defendant had the purpose to commit robbery or took a substantial step in the commission of first degree robbery. Fourth, Defendant claims the trial court plainly erred in overruling Defendant's motion for judgment of acquittal and sentencing Defendant for first degree tampering, because the State did not prove beyond a reasonable doubt that Defendant operated the vehicle knowing he did so without the consent of the owner. Fifth, Defendant asserts the trial court plainly erred in allowing the State to elicit testimony from Officer Taylor that Defendant did not ask why he was under arrest when he was arrested, because such testimony was an improper use of Defendant's post-arrest silence as affirmative proof of his guilt.

### Standard of Review

■ As the parties note, the five points on appeal are subject to the plain error standard of review because they were not properly preserved during the proceedings before the trial court. The failure properly to preserve the challenges occurred at different parts of the trial court proceedings, either during trial, in the post-trial motions, or after the trial court's disposition of Defendant's post-trial motions. Plain error review is discretionary with this Court. Supreme Court Rule 30.20. We grant relief under the plain error standard only when the alleged error will so substantially affect a defendant's rights that a manifest injustice or a miscarriage of justice results if left uncorrected. *State v. Santillan*, 1 S.W.3d 572, 578 (Mo.App. E.D.1999). The defendant seeking plain error review bears the burden of demonstrating a manifest injustice or miscarriage of justice. *State v. Louis*, 103 S.W.3d 861, 864 (Mo.App. E.D.2003). The Missouri Supreme Court has observed that, on direct appeal, a manifest injustice or miscarriage of justice exists so as to entitle a defendant to relief for plain error only when the error is outcome determinative. *Deck v. State*, 68 S.W.3d 418, 427 (Mo. banc 2002).

### Lay Witness Opinion Testimony

In his first point, Defendant asserts the trial court plainly erred in permitting Officer Youngblood and Detective Newsham to testify that, in their opinions, the suspect in the videotapes and still photographs from the videotapes at the ATMs was Defendant, because that testimony invaded the province of the jury to decide the ultimate issue of the suspect's identity and these witnesses were in no better position than the jurors to draw conclusions from the available evidence. Specifically, Defendant urges the trial court plainly erred in allowing the State to elicit opinion testimony from Detective Newsham that the person depicted in the videotapes and photographs from the November 2000 incidents was Defendant, and that the sus-

pect's clothing in those exhibits was the same as that recovered from Defendant and Tabb on December 4, 2000. Defendant also argues the trial court plainly erred by allowing the State to elicit Officer Youngblood's opinion that Defendant was the individual depicted in the photographs from the November 2000 incidents.

■ To establish a manifest injustice or a miscarriage of justice for plain error due to the erroneous introduction of evidence, "there must be an apparent prejudice to defendant. *State v. Fuente,* 871 S.W.2d 438, 443 (Mo. banc 1994). Prejudice is not considered apparent when there is ample other evidence to support the conviction. *Id.*" *State v. Jimmerson,* 891 S.W.2d 470, 472 (Mo.App. E.D.1994).

■ A "trial court has wide discretion in admitting the testimony of a lay witness into evidence." *State v. Winston,* 959 S.W.2d 874, 877 (Mo.App. E.D.1997). Generally, a lay witness may not testify regarding the witness' opinion on a matter in dispute because the lay witness lacks specialized knowledge about the matter and, therefore, the jury and lay witness "are in equal positions to form an accurate opinion." *Id.* When "the trier of fact is as capable as the witness to draw conclusions from the facts provided," opinion testimony is usually inadmissible. *State v. Gardner,* 955 S.W.2d 819, 823 (Mo.App. E.D. 1997). There are, however, some limited exceptions. *See Id.* Importantly, "in the identification context, a lay witness' opinion testimony is admissible if there is a basis for concluding that the witness is more likely to correctly identify the defendant than is the jury." *Winston,* 959 S.W.2d at 877–78.

Both *Gardner* and *Winston* illustrate instances when we have found a trial court properly admitted a lay witness' identification of a defendant from videotape evidence. In *Gardner,* a police officer testi-

fied that the defendant was the man on a videotape obtained from a surveillance camera taping during the commission of the crime and that he had known the defendant for approximately ten years. *Gardner,* 955 S.W.2d at 822. We concluded that, in light of the officer's familiarity with the defendant for ten years, the officer's "identification provided assistance to the trier of fact because of the poor quality of the tape and [the defendant's] obscuring of part of his face" on the videotape. *Id.* at 825.

In *Winston,* we upheld the admission of the testimony of the defendant's girlfriend's sister who identified the defendant as the person in a print generated from a videotape of the surveillance camera taping during the commission of a crime. *Winston,* 959 S.W.2d at 877–78. Upon observing that the person in the videotape printout was moving quickly and was difficult to see, we held there was a basis for finding the sister "was more likely to correctly identify the defendant than was the jury" because the sister had spent time with the defendant during the time immediately surrounding the crimes, and was familiar with his features. *Id.* at 878.

Here, the videotapes and photographs from the videotapes depict at most either a profile of the suspect or a front view of a covered face of the suspect. The eight clearest prints from the videotapes showing people involved in the November 11th and November 27th incidents show a profile of the suspect, who appears to be wearing a long-sleeved jacket or coat and a band or cap around his forehead. The six clearest prints from the videotape of the November 28th incident depict a front view of the suspect wearing a long-sleeved jacket or coat, at least one collared shirt, a band around his forehead, and something covering the end of his nose and all of his mouth. While it is not easy to identify the

person depicted in the videotapes and photographs from the videotapes, we are convinced that the admission of Officer Youngblood's and Detective Newsham's identification testimony was plain error because there was no indication of record that either one of these witnesses had met or knew Defendant at any time prior to these incidents. Therefore, these witnesses were in no better position than the jury to identify the person or clothing in the photographs and videotapes in evidence. Additionally, there is not ample other evidence against Defendant regarding the November 2000 offenses.

The evidence viewed in the light most favorable to the guilty verdicts on the November 2000 offenses shows that: During the evening of November 11, 2000, Bornhop went to the Fern Ridge ATM to make a deposit. While she was making efforts to complete the deposit, a man approached her and displayed a gun. The man demanded her personal identification number (PIN) for the ATM. After a few moments passed during which the man unsuccessfully attempted to make a withdrawal, Bornhop entered the PIN and the man successfully withdrew $500.00, which he kept. The man threw the ATM card and the receipt on the floor of Bornhop's car, and demanded that Bornhop give him her cellular phone, but she did not have one. After looking in Bornhop's purse, the man walked away. Bornhop then drove away and notified the police.

Later that evening Bornhop helped the police create a composite of the man who robbed her. Approximately one month later, Bornhop viewed a photographic lineup, and chose a man who was not Defendant. Bornhop testified that the man she chose during that lineup was the result of a guess she made between two photographs of individuals she could not clearly eliminate, and that she made the choice based on the skin tone and clothing of the man in the photograph.

On November 27, 2000, police were notified of a "holdup" at the same ATM. In response to that report, Officer Muehlenbeck visited Park and then went to the Fern Ridge ATM parking lot looking for anything that may have dropped during the incident and for a suspect matching Park's description. He found nothing there. Park's bank records indicate withdrawals totaling approximately $700.00 at another ATM on November 28, 2000, within two hours of the incident involving Park at the Fern Ridge ATM. Defendant was not an authorized user of Park's bank account.

Detective Newsham, the lead detective investigating these incidents, asked for police surveillance of the Fern Ridge ATM, and provided officers with descriptions of the suspect and photographs from the videotapes recorded by the ATMs during the November 2000 incidents. The suspect was described as a black male, between 5' 9" and 5' 10", weighing about 160 pounds, having a light complexion, and wearing a dark colored leather jacket with stitching on the sleeve.

On the evening of December 4, 2000, Officers Youngblood, Taylor, and Kelling, among others, conducted surveillance of the Fern Ridge ATM. At 7:15 p.m., the officers observed a silver Tahoe with no front license plate travelling the streets around the ATM with a driver and one passenger inside. The passenger, later identified as Tabb, exited the Tahoe, while the driver of the Tahoe, subsequently identified as Defendant, parked in an area from which the ATM and surrounding area could be viewed. Tabb, while talking on a cellular phone, began walking toward a vehicle at the ATM, then stopped approximately ten to fifteen feet from the vehicle before walking and then running away as

the car at the ATM drove off. Specifically, Officer Youngblood testified:

> There was a car at the ATM. [Tabb] started to approach the vehicle at the ATM. He got approximately ten to fifteen feet away, he cut back across towards Fern Ridge, then walked across Fern Ridge into the parking lot we were ... in the whole time. He was on a cellular phone talking to someone. He stood there for a minute.
>
> When the vehicle started to drive away, he started walking across Fern Ridge. When the vehicle was out of sight, he began running back to the building.

Officer Kelling then found Tabb near some bushes in the vicinity of the Fern Ridge ATM and arrested him. Upon Tabb's arrest, a pellet gun, which was found in the sleeve of Tabb's coat, a black headband with a "Tasmanian Devil" insignia on it, and a cellular phone were recovered by police.

During the time of Tabb's apprehension, Officer Taylor stopped near the Tahoe and observed Defendant speaking on a cellular phone. When Officer Taylor arrested Defendant as he left the Tahoe, a cellular phone fell from the vehicle. Officer Taylor also noticed binoculars inside the Tahoe. At the time of his arrest, Defendant was wearing a black leather jacket.

After the arrest of Tabb and Defendant, Officer Youngblood called the number last dialed on Tabb's cellular phone and the cellular phone recovered from the silver Tahoe rang. Telephone company records indicate Defendant owned these two cellular phones and calls were made between those two phones at the time of the Park incident on November 27th and during the time immediately preceding the arrest of Tabb and Defendant on December 4, 2000.

The Missouri license plate on the Tahoe had been stolen from another person's vehicle in 2000. The Vehicle Identification Number (VIN) on the silver Tahoe matched the VIN on one reported stolen from the Jim Butler Chevrolet dealership. The dealership's general manager testified that sometime late in November 2000 there was a break-in at the dealership's new truck center. They performed a vehicle inventory the next day and did not discover any vehicle missing. Several days later they did another vehicle inventory, and discovered a blue Tahoe was missing. Several more days after that they noticed a silver Tahoe was missing. The silver Tahoe was reported missing as of December 5, 2000.

During trial, Bornhop was not expressly asked to identify Defendant as the man who robbed her. Park did not testify at trial, and there was no evidence introduced at trial that Park participated in any pretrial identification procedures. No eyewitnesses to the November 2000 incidents testified at trial.

For purposes of identifying Defendant as the perpetrator of the November 2000 incidents, the State played the videotapes recorded at the two ATMs during the November 2000 incidents, while Detective Newsham described what was depicted in the videotapes. The State also introduced photographs from those videotapes; the composite sketch and photographic lineup for the Bornhop incident; the jacket taken from Defendant on December 4, 2000; the headband and pellet gun taken from Tabb on December 4, 2000; the two cellular phones recovered from Tabb and Defendant; records for those two cellular phones; three photographs of Defendant taken before 2000; and a photograph of Defendant at the time of his arrest. Additionally, the State introduced the testimony of Officer Youngblood and Detective Newsham, the testimony that is the subject of this point.

Officer Youngblood testified that, before the December 4, 2000, surveillance, Detective Newsham had provided him with a description and photographs from the November ATM incidents (marked Exhibits 29L, 29M, and 29P). Officer Youngblood testified that "the individual in these photos looked like" Defendant and, specifically, the hair and eyes in one of the photographs[3] allowed him to make the identification.

Detective Newsham testified he spent "numerous hours over the course of weeks watching" the videotapes of the November 2000 incidents, made comparisons between those tapes, and concluded the same person was involved in all three incidents. He based that conclusion on a left profile of the suspect's face and the suspect's clothing. Detective Newsham testified that the black headband obtained from Tabb and the jacket recovered from Defendant at the time of their arrest on December 4, 2000, were the same as those worn by the suspect in the videotapes, and related photographs. Newsham also testified that some of the clothing Defendant wore in earlier, unrelated photographs that were introduced into evidence could be seen on some of the videotapes and photographs from the videotapes of the November 2000 incidents. As a result of his familiarity with the videotapes, pictures, and descriptions provided by the victims, Detective Newsham testified that he knew the person involved in the November 2000 ATM incidents was Defendant.

■ In the case at bar, there is not the same level of familiarity with Defendant that was present in *Gardner, supra,* and *Winston, supra.* There was no evidence or testimony that either Detective Newsham or Officer Youngblood knew or had met Defendant at any time prior to his arrest on December 4, 2000. Any identification by these two police officials is based solely on a review of the evidence that was equally available to the jurors trying the case. There was nothing that Detective Newsham or Officer Youngblood, given their limited familiarity with Defendant, offered to the jury that the jury could not have concluded on its own.

We conclude these witnesses' identification testimony was improperly admitted because there was no evidence that they were personally familiar with Defendant at any time prior to the time when the offenses or investigation occurred. Their testimony is based solely on their perception of the videotape, photograph, and clothing evidence also available to the jury. There is no basis for concluding these lay witnesses were more likely than the jury to correctly identify Defendant. The police officers' conclusive identifications of Defendant may have preempted the jury's decision regarding whether Defendant was the person in the pictures or videotapes. We note that the jury never asked to view

---

**3.** In arguing this point, Defendant points to testimony by Officer Youngblood discussing a photograph purportedly labeled Exhibit 29B. During this testimony, he is asked about a hat or cap in the photograph, that he points out is "like a band of some type" that goes over the person's ears and another band that goes around the person's face. When asked "[w]hat is it on 29B that allows you to make that identification?," Officer Youngblood responds "His eyes, his hair."

Exhibit 29B is a series of three black and white photographs, one of which depicts a car at an ATM, and the other two of which depict what looks like a jacket shoulder. Neither of the photographs in that exhibit are pictures of a person's head or face, with or without bands. Exhibit 32B and Exhibit 29P, however, do depict a person's face, covered by what looks like two bands. We address this point assuming that this challenged portion of Officer Youngblood's testimony was directed to Exhibit 29P or Exhibit 32B rather than to Exhibit 29B.

the exhibits regarding the identification of the Defendant during deliberations.

■ Moreover, this improperly admitted identification testimony resulted in apparent prejudice to Defendant given the limited other evidence used to convict Defendant of the charges arising from the incidents on November 11, 27, and 28, 2000. No victim identified Defendant as the perpetrator of the November 2000 incidents, either prior to trial or during trial. No eyewitness testimony and no fingerprint evidence attempts to connect Defendant with those offenses. While a jacket that appears to be in the videotape and photographic evidence was being worn by Defendant when he was arrested on December 4th, no other clothing appearing in the videotapes or photographs of the November 2000 incidents was being worn by Defendant at the time of his arrest on December 4th. Moreover, no evidence connected the pellet gun found on Tabb at the time of his arrest on December 4, 2000, with any November 2000 incident.

Accordingly, we reverse and remand for new trial the judgment regarding the first degree robbery charge arising out of the Bornhop incident on November 11, 2000, and the fraudulent use of a credit device charge arising out of the use of Park's ATM card on November 28, 2000, only. While our discussion and resolution of this first point would require the reversal and remand of the judgment and sentence entered for stealing a credit card, we are reversing that judgment and sentence outright due to our resolution of Defendant's second point below. Therefore, the stealing a credit card offense is not being remanded for retrial as part of the resolution of this point.

Point one is granted.

### Stealing A Credit Card

In his second point, Defendant contends that, after sustaining his motion for judgment of acquittal on the second degree robbery offense, the trial court plainly erred in entering a judgment of conviction and sentencing him for stealing a credit card. Defendant urges there was insufficient evidence of the elements of that offense and the jury was not required to find each of the elements of that offense. In particular, Defendant contends there was insufficient evidence that Defendant took property from Park without Park's consent or by deceit or coercion.

■ If there is insufficient evidence to sustain a conviction, "plain error affecting substantial rights is involved from which manifest injustice must have resulted." *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc) (internal quotation marks omitted) (*quoting State v. Withrow*, 8 S.W.3d 75, 77 (Mo. banc 1999)), *cert. denied*, 534 U.S. 1030, 122 S.Ct. 567, 151 L.Ed.2d 440 (2001). We limit our review of a challenge to the sufficiency of the evidence supporting a criminal conviction to a determination whether sufficient evidence was presented from which a reasonable juror could find the defendant guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). For this review, we consider the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict, and disregard all contrary evidence and inferences. *Id.* While reasonable inferences may be drawn from direct and circumstantial evidence, "the inferences must be logical, reasonable and drawn from established fact." *State v. West*, 21 S.W.3d 59, 62–63 (Mo.App. W.D. 2000). "In considering the sufficiency of the evidence, there must be sufficient evidence of each element of the offense."

*State v. Dixon,* 70 S.W.3d 540, 544 (Mo. App. W.D.2002).

The State concedes, under the facts of this case, that the trial court plainly erred in entering judgment and imposing sentence for stealing a credit card in violation of Section 570.030.3(3)(c), but urges us to remand for entry of a judgment convicting Defendant of the offense of stealing from a person in violation of Section 570.030.3(2).

 "The elements of stealing are: (1) an appropriation; (2) of property or services; (3) of another; (4) with the purpose to deprive the other thereof; and (5) accomplished either without the owner's consent or by deceit or coercion." *State v. Chapman,* 876 S.W.2d 15, 17 (Mo.App. E.D.1994); Section 570.030.1. Both stealing a credit card under Section 570.030.3(3)(c) and stealing from a person under Section 570.030.3(2), in fact any stealing charge under Section 570.030, require the factfinder to find beyond a reasonable doubt that the appropriation occurred without the person's consent or by deceit or coercion. Section 570.030.1.

 Viewing the evidence in a light favorable to the verdict, the evidence regarding the November 27, 2000, incident involving Park reveals only the following: On November 27, 2000, police were notified of a "holdup" at the Fern Ridge ATM. In response to that report, Officer Muehlenbeck visited Park and then went to the Fern Ridge ATM parking lot looking for anything that may have dropped during the incident and for a suspect matching Park's description. He found nothing there. Park's bank records indicate withdrawals totaling approximately $700.00 at another ATM on November 28, 2000, within two hours of the incident involving Park at the Fern Ridge ATM. Defendant was not an authorized user of Park's bank account.

There is no evidence of the manner in which Defendant acquired the card from Park. Neither Park nor Defendant testified at trial and no eyewitness to this incident testified. At most, the photographic and videotaped evidence of the November 27th incident depicts a man wearing a band around his forehead standing between the open driver's side door of Park's vehicle and the vehicle, while facing Park, and Park facing toward the open door of the vehicle with his head turned toward the man. There is no indication that Park handed his ATM card to the man, or that the man otherwise took the ATM card from Park, the ATM machine, the vehicle, or that vicinity. There is no indication that the man obtained the ATM card during the incident. There is no evidence of any conversation between the man and Park. There is no evidence of any weapon displayed or used during the incident, or of any physical altercation between the two men. There is no evidence that Defendant acquired Park's ATM card without Park's consent, or by deceit or coercion.

Because there is insufficient evidence that Park's ATM card was appropriated from him "either without his consent or by deceit or coercion," an element of any stealing violating Section 570.030, there was plain error affecting substantial rights requiring the reversal of the stealing a credit card conviction and sentence. We do not remand for further consideration of any charge of stealing in violation of Section 570.030 that might be considered a lesser included offense of second degree robbery, because that element is a prerequisite to finding someone guilty of any stealing offense under Section 570.030. In view of our disposition of this point, we will not address the State's concession that the trial court plainly erred in entering judgment against and imposing sentence on Defendant for stealing a credit card.

Therefore, Defendant's stealing a credit card judgment is reversed.

Point two is granted.

### Attempted First Degree Robbery

In his third point, Defendant urges the trial court plainly erred by overruling Defendant's motion for judgment of acquittal and sentencing Defendant for attempted first degree robbery, because the State did not prove beyond a reasonable doubt that Defendant had the purpose to commit robbery or took a substantial step in the commission of first degree robbery.

"If the evidence is insufficient to sustain a conviction, plain error affecting substantial rights is involved from which manifest injustice must have resulted." *Whalen*, 49 S.W.3d at 184 (internal quotation marks omitted) (*quoting Withrow*, 8 S.W.3d at 77). We limit our review of a challenge to the sufficiency of the evidence supporting a criminal conviction to a determination whether sufficient evidence was presented from which a reasonable juror could find the defendant guilty beyond a reasonable doubt. *Grim*, 854 S.W.2d at 405. For this review, we consider the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict, and disregard all contrary evidence and inferences. *Id.* While reasonable inferences may be drawn from direct and circumstantial evidence, "the inferences must be logical, reasonable and drawn from established fact." *West*, 21 S.W.3d at 62–63. "In considering the sufficiency of the evidence, there must be sufficient evidence of each element of the offense." *Dixon*, 70 S.W.3d at 544.

▆▆▆▆ The relevant attempt statute provides in part that

[a] person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A "substantial step" is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

Section 564.011.1. To establish an attempt under this statute, the State must prove only two elements: that the defendant has the purpose to commit the underlying offense and that the defendant performed an act which is a substantial step toward committing that offense. *Withrow*, 8 S.W.3d at 78. Determining whether a defendant's actions constitute a substantial step is fact intensive and requires the weighing of the circumstances of the case on an individual basis. *State v. Ballenger*, 72 S.W.3d 154, 157 (Mo.App. W.D.2002). A substantial step toward the commission of the underlying crime may be less than the last act needed to commit the underlying crime but "must be something more than mere preparation" to commit that crime. *Id.* (internal quotation marks omitted) (*quoting State v. O'Brien*, 5 S.W.3d 532, 534 (Mo.App. W.D.1999)). Importantly, a conclusion that a defendant was attempting to commit an underlying offense may not be based upon speculation. *Id.*

Here, Defendant was charged with attempted first degree robbery arising out of the December 4, 2000, incident. A person commits first degree robbery "when he forcibly steals property and in the course thereof he, or another participant in the crime": causes serious physical injury; is armed with a deadly weapon; uses or threatens immediate use of a dangerous instrument against a person; or "[d]isplays or threatens the use of what appears to be a deadly weapon or dangerous instrument." Section 569.020.1.

Viewing the relevant evidence and its reasonable inferences in the light most favorable to the jury's verdict, the record

reveals the following: On the evening of December 4, 2000, Officers Youngblood, Taylor, and Kelling, among others, conducted surveillance of the Fern Ridge ATM. The officers knew that one or more ATM customers had recently been accosted by someone while using the ATM, with at least one of those customers reporting the man accosting her had displayed a gun. The officers had been provided with a description of a suspect and photographs made from ATM surveillance tapes.

At 7:15 p.m., the officers observed a silver Tahoe with no front license plate travelling the streets around the ATM with a driver and one passenger inside. The passenger, later identified as Tabb, exited the Tahoe, while the driver of the Tahoe, subsequently identified as Defendant, parked in an area from which the ATM and surrounding area could be viewed. Tabb, while talking on a cellular phone, began walking toward a vehicle at the ATM, then stopped approximately ten to fifteen feet from the vehicle before walking and then running away as the car at the ATM drove off. Specifically, Officer Youngblood testified:

> There was a car at the ATM. [Tabb] started to approach the vehicle at the ATM. He got approximately ten to fifteen feet away, he cut back across towards Fern Ridge, then walked across Fern Ridge into the parking lot we were . . . in the whole time. He was on a cellular phone talking to someone. He stood there for a minute.
>
> When the vehicle started to drive away, he started walking across Fern Ridge. When the vehicle was out of sight, he began running back to the building.

Officer Kelling then found Tabb near some bushes in the vicinity of the Fern Ridge ATM and arrested him. Upon Tabb's arrest, a pellet gun, which was found in the sleeve of Tabb's coat, a black headband with a "Tasmanian Devil" insignia on it, and a cellular phone were recovered by police.

During the time of Tabb's apprehension, Officer Taylor stopped near the Tahoe and observed Defendant speaking on a cellular phone. When Officer Taylor arrested Defendant as he left the Tahoe, a cellular phone fell from the vehicle. Officer Taylor also noticed binoculars inside the Tahoe.

After the arrest of Tabb and Defendant, Officer Youngblood called the number last dialed on Tabb's cellular phone and the cellular phone recovered from the silver Tahoe rang. Telephone company records indicate Defendant owned these two cellular phones and calls were made between those two phones during the time immediately preceding the arrest of Tabb and Defendant on December 4, 2000.

We conclude this evidence, viewed in the light most favorable to the verdict, does not support a determination by reasonable jurors that, beyond a reasonable doubt, Defendant committed a substantial step toward first degree robbery. At most, the arguably suspicious conduct of Defendant and Tabb may have constituted acts in preparation of robbery.

The Western District's decision in *Ballenger*, on which Defendant relies, supports our reversal of Defendant's attempted first degree robbery conviction. In that case, the Western District reversed a conviction for attempted stealing of anhydrous ammonia, a chemical used both in agriculture and in the production of methamphetamine, upon finding insufficient evidence to support a determination the defendant had taken a substantial step toward stealing anhydrous ammonia. *Ballenger*, 72 S.W.3d 154.

There, two police officers were conducting surveillance on a farm where anhy-

drous ammonia was stored in an applicator tank, when a truck stopped near the tank at about 1:00 a.m. *Id.* at 155. A person exited the truck, walked towards the tank, and shined a flashlight at the top of the tank where one would access the anhydrous ammonia. *Id.* As the officers began to walk toward the truck, the person returned to the truck. *Id.* The officers stopped the truck as it was being driven away, and arrested the three individuals in the truck, including the defendant. *Id.* The defendant was charged with attempting to steal anhydrous ammonia. *Id.* One of the officers testified that, after he made the arrest, all three individuals denied having a flashlight. *Id.* A flashlight seized from the truck, as well as a seven-gallon water container of the sort commonly used to transport anhydrous ammonia, which was discovered in the truck bed, were admitted into evidence. *Id.* at 155–56. The co-owner of the farm testified that in order for someone to gain access to the applicator tank on his farm, a driver would have to turn off the public road and drive a quarter mile. *Id.* at 156.

The Western District concluded that, while the defendant's conduct was suspicious, it did not rise to the level of a substantial step towards the stealing of anhydrous ammonia. *Id.* at 157–58. The court specifically found there was no physical contact with the tank, the actions at the tank took "a very limited period of time," no one took affirmative steps to remove the water container from the truck bed or to remove the substance from the tank, and there was no evidence that anyone took some sort of physical possession over the anhydrous ammonia which the defendant was charged with attempting to steal. *Id.*

Here, while the circumstances were not as brief as the flashlight view of the tank in *Ballenger* and although a pellet gun was found on Tabb at the time of his arrest on December 4, 2000, the circumstances do not demonstrate Defendant or Tabb made a substantial step toward committing first degree robbery. Neither Tabb nor Defendant displayed, used, or threatened the use of any dangerous instrument or deadly weapon. Nor did Tabb or Defendant accost a person so as to convey a desire or threat to forcibly steal property from or to seriously injure a person. While Tabb approached the ATM, he walked away before getting close to a person using it and before taking any action to indicate he was trying to forcibly steal any property from anyone. Without speculating, reasonable jurors could not find beyond a reasonable doubt that Defendant took a substantial step toward committing first degree robbery under these circumstances.

We are not presented here with a situation similar to other cases in which we have found sufficient evidence to support an attempted first degree robbery conviction. For instance, in *State v. Clampitt*, 956 S.W.2d 403 (Mo.App. E.D.1997),[4] there was evidence that the defendant and three friends discussed robbing the victim because they knew the victim carried large amounts of cash. *Id.* at 404. The defendant later acquired a gun and a friend drove him to the victim's house. *Id.* at 405. The defendant "snuck up to the [victim's] house carrying the gun," hid, fired two shots when he saw the victim through the window, and heard the victim scream before fleeing with his friend. *Id.* We

---

**4.** While we found there was sufficient evidence to support the defendant's attempted first degree robbery conviction, we reversed and remanded the case for a new trial upon finding, as the parties agreed, that the trial court erred in refusing to disqualify the assistant prosecuting attorney who participated at trial. *Clampitt*, 956 S.W.2d at 404.

concluded this was sufficient evidence for a reasonable juror to conclude beyond a reasonable doubt that the defendant had the intent to and took a substantial step toward commission of first degree robbery. *Id.* Similarly, in *State v. Rogers*, 959 S.W.2d 467 (Mo.App. E.D.1997), we found the defendant's repeated demands for money, the victims' perception of the presence of a gun, and the defendant's threats of physical harm to one victim "proved a substantial step towards the commission of the robbery and were strongly corroborative that defendant meant to rob the restaurant." *Id.* at 469. Therefore, we concluded there was sufficient evidence for reasonable jurors to find the defendant guilty of attempted first degree robbery. *Id.*

These cases are factually distinguishable from the present case in that here there was no display, use, or threatened use of a gun or other dangerous instrument or deadly weapon by Defendant or Tabb during the December 4, 2000, incident. Additionally, there was no evidence of any victim perceiving that Defendant or Tabb had a dangerous instrument or deadly weapon, and no other evidence regarding Defendant's purpose to complete the commission of first degree robbery.

Our decision in *State v. Stewart*, 537 S.W.2d 579 (Mo.App. E.D.1976), does not require a different result because it is factually distinguishable. In *Stewart*, we affirmed the defendant's conviction for attempted first degree robbery and carrying a concealed weapon. *Id.* at 580, 584. The defendant and three accomplices had planned to rob a courier as he left a bank with payroll money. *Id.* at 581. The four suspects armed themselves and took their assigned positions approximately sixty feet or more from the bank. *Id.* The police, who were conducting surveillance, intervened and arrested the four men when the courier got approximately fifteen feet outside the bank and before any of the suspects had drawn a weapon or threatened the courier. *Id.* On appeal, the defendant argued there was no overt act sufficient to constitute attempted robbery. *Id.* at 580. We held the evidence supported the attempted robbery charge, stating in pertinent part: "When the four men drove to the bank, alit and took up their assigned positions, then being armed, ready, willing and able to intercept, assault and rob the courier, they had then gone beyond mere preparation." *Id.* at 583–84.

That case involved a robbery plot that was known in advance by the police because one of the participants had disclosed the plan to the police before the offense took place. *Id.* at 581. To the contrary, here the police did not have information from any participant regarding a planned robbery at the Fern Ridge ATM on December 4, 2000, and on that date there was no weapon displayed to a victim, no serious physical injury inflicted on anyone, and no physical or verbal conduct by Tabb or Defendant indicating a threat to use or use of a dangerous instrument or deadly weapon against anyone. There also was no indication of any forcible stealing of property from anyone. Unlike in the *Stewart* case, we would have to speculate to determine what offense was being attempted by Defendant at the time of his and Tabb's arrests on December 4th.

Because we conclude there is insufficient evidence to support the attempted first degree robbery conviction and sentence, there was plain error affecting substantial rights requiring the reversal of that conviction and sentence. Therefore, Defendant's attempted first degree robbery judgment is reversed.

Point three is granted.

### Tampering in the First Degree

In his fourth point, Defendant claims the trial court plainly erred in overruling Defendant's motion for judgment of acquittal and sentencing Defendant for first degree tampering, because the State did not prove beyond a reasonable doubt that Defendant operated the vehicle knowing he did so without the consent of the owner.

As we stated earlier, "[i]f the evidence is insufficient to sustain a conviction, plain error affecting substantial rights is involved from which manifest injustice must have resulted." *Whalen*, 49 S.W.3d at 184 (internal quotation marks omitted) (*quoting Withrow*, 8 S.W.3d at 77). In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we are limited to determining whether sufficient evidence was presented from which a reasonable juror could find the defendant guilty beyond a reasonable doubt. *Grim*, 854 S.W.2d at 405. For this review, we consider the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict, and disregard all contrary evidence and inferences. *Id.* The inferences drawn from direct and circumstantial evidence must "be logical, reasonable and drawn from established fact." *West*, 21 S.W.3d at 62–63. "In considering the sufficiency of the evidence, there must be sufficient evidence of each element of the offense." *Dixon*, 70 S.W.3d at 544.

█ Defendant was charged with first degree tampering in the operation of a motor vehicle in violation of Section 569.080.1(2). That statute provides in relevant part that "[a] person commits the crime of tampering in the first degree if . . . [h]e knowingly . . . or unlawfully operates an automobile . . . without the consent of the owner thereof." Section 569.080.1(2). To establish this offense, the State must prove the "defendant knew he was operating the car without the consent of the owner." *State v. McIntyre*, 735 S.W.2d 111, 112 (Mo.App. E.D.1987). In a first degree tampering case, such as this, "[d]irect proof of the required mental state [may not be] available and such intent [may be] inferred from circumstantial evidence. Even in a circumstantial evidence case, the evidence need not be conclusive of guilt, nor must the evidence exclude every hypothesis of innocence." *State v. Martin*, 882 S.W.2d 768, 770 (Mo.App. E.D.1994) (citations omitted).

█ Proof of a defendant's knowledge he is operating a motor vehicle without the owner's consent may take several forms. When a defendant is stopped while operating a stolen vehicle, evidence such as the presence of a broken steering column in the vehicle, the presence of a tool used to bypass the ignition key, and use of keys in the ignition that do not start the vehicle is "strong evidence to support the inference that defendant 'knowingly' operated the vehicle without the owner's consent." *Id.* Additionally, the knowledge element for first degree tampering may be established through evidence that links the defendant who is stopped while operating a stolen vehicle to the theft of that vehicle. *McIntyre*, 735 S.W.2d at 112. However, merely driving a stolen vehicle, "without more, does not establish a sufficient factual basis to allow an inference of guilt to convict" a defendant of first degree tampering. *In the Interest of V.L.P.*, 947 S.W.2d 546, 547–48 (Mo.App. W.D.1997).

In *In the Interest of V.L.P.*, the Western District determined that the evidence was not sufficient to establish the defendant, who was arrested while operating a stolen vehicle, had the intent necessary to establish first degree tampering with respect to that vehicle. *Id.* The record showed that the vehicle had been rented to an individual in January 1996, the rental agency was

subsequently notified the vehicle had been stolen, and the defendant was stopped by police and arrested in May 1996 while driving the vehicle with a friend. *Id.* at 546–47. The arresting officer noticed the car's keys were in the ignition, and neither the steering column nor any window was broken. *Id.* at 547. The defendant testified that his cousin had been driving the vehicle and took the defendant to a house where the cousin asked the defendant to drive another person on errands, which the defendant was doing at the time of his arrest. *Id.* In finding the evidence insufficient to support a first degree tampering conviction for knowingly operating a motor vehicle without the owner's consent, the Western District distinguished the case from those holding "a defendant's exclusive and unexplained possession of a recently stolen automobile . . . may authorize the fact finder to draw an inference that the possessor had knowledge that the automobile was stolen." *Id.* at 548 (footnote omitted). The Western District also noted there was no evidence that the vehicle "had been recently stolen before the [defendant] took possession" of it. *Id.*

 Here, Defendant was charged with first degree tampering in violation of Section 569.080.1(2) on December 4, 2000, by "knowingly and without the consent of the owner unlawfully operat[ing] a motor vehicle, . . .:[a] 2001 Chevrolet Tahoe, [having a] VIN 1GNEK13T21J158760." As noted in our earlier discussions, Defendant was arrested on December 4, 2000, as he departed a Tahoe after driving it near an ATM.

The record also reveals that in late November 2000, someone broke into the new truck center at the Jim Butler Chevrolet dealership (Butler). No vehicle was discovered missing during a vehicle inventory the next day. During another vehicle inventory several days later, they discovered a blue Tahoe was missing. Several more days later they determined that a silver Tahoe was missing and reported it. The VIN for the missing silver Tahoe matched the VIN of the silver Tahoe recovered from Defendant when he was arrested on December 4, 2000. The dealership had not given Defendant permission to operate the silver Tahoe. The record further establishes that the silver Tahoe recovered at the time of Defendant's arrest had one Missouri license plate on it. The person owning that license plate testified it had been stolen from one of his vehicles.

While the record discloses the vehicle owner did not give Defendant permission to operate the silver Tahoe, there is insufficient evidence of Defendant's knowledge he operated that vehicle without the owner's permission. There was no evidence of physical damage to the vehicle indicating it may have been broken into or forcefully removed from a prior location. There was no evidence that anything other than the silver Tahoe's keys was used to operate its ignition. There is no evidence connecting Defendant to the taking of the silver Tahoe from Butler and no evidence showing Defendant knew the vehicle had been taken from Butler without permission. At most the record contains evidence that Defendant was simply driving a stolen vehicle, and in accordance with the Western District's decision in *In the Interest of V.L.P.*, that alone is not "a sufficient factual basis to allow an inference of guilt to convict" Defendant of first degree tampering. *In the Interest of V.L.P.*, 947 S.W.2d at 547–48.

As in that case, the case now before us does not fit within the case law authorizing a fact finder to infer Defendant, who possessed a stolen vehicle, knew the vehicle was stolen. *See Id.* at 547–48. That is because here there is no evidence Defendant's unexplained possession of the silver

Tahoe was exclusive or uninterrupted, and there is insufficient evidence that the stealing of the silver Tahoe was "recent." In *In the Interest of V.L.P.*, the Western District concluded that the evidence was insufficient because there was an absence of "evidence as to when [the vehicle operated by the defendant] was stolen" and "no evidence that the property had been recently stolen before the [defendant] took possession" of it. *Id.* at 548. The same lack of evidence exists in our case. There is no evidence here of when Defendant took possession of the silver Tahoe and no evidence the silver Tahoe had been recently stolen just before Defendant took possession of it. Absent more evidence of the timing of both the unlawful taking of the silver Tahoe from Butler and the possession of the vehicle by Defendant, we find a reasonable juror could not find, beyond a reasonable doubt, that Defendant was guilty of first degree tampering with respect to the December 4, 2000, operation of the silver Tahoe. *Cf. State v. Langdon*, 110 S.W.3d 807 (Mo. banc 2003) (finding insufficient evidence to support a conviction for receiving stolen property by retaining it in violation of Section 570.080, in part because evidence was not sufficient to establish the defendant had unexplained possession of recently stolen property).

Because we conclude there is insufficient evidence to support the first degree tampering conviction and sentence, there was plain error affecting substantial rights requiring the reversal of that conviction and sentence. Therefore, we reverse the judgment of Defendant's conviction and sentence for first degree tampering.

Point four is granted.

### Post-arrest, Pre–Miranda Silence

In his fifth point, Defendant contends that the trial court plainly erred in allowing the State to elicit testimony from Officer Taylor that, upon his arrest, Defendant did not ask why he was under arrest. Defendant asserts the admission of this testimony violated his right to due process and his right against self-incrimination, because the testimony was an improper use of Defendant's post-arrest silence as affirmative proof of his guilt.

We will not address this point because it should not arise on retrial. *See State v. Graves*, 27 S.W.3d 806, 809–12 (Mo.App. W.D.2000).

### Conclusion

In summary, Defendant's convictions pursuant to the judgment for stealing a credit card, attempted first degree robbery, and first degree tampering in the operation of a motor vehicle are reversed. The remaining convictions pursuant to the judgment for first degree robbery and fraudulent use of a credit device are reversed and remanded for new trial.

GEORGE W. DRAPER III, concurs in result in separate opinion.

ROBERT G. DOWD, JR., P.J., dissents in separate opinion.

GEORGE W. DRAPER III, Judge, concurring.

I respectfully concur in the principal opinion as to Points I, II, IV, and V. However, I cannot join the rationale expressed by the principal opinion supporting reversal of Point III.

The principal opinion is positing that the State could not prove Defendant had the apparent possibility to commit the crime, *see State v. Mulder*, 916 S.W.2d 346 (Mo. App. E.D.1996), because the intended victim left, and there was no contact with the victim. This "no contact" analysis is extracted from *State v. Ballenger*, 72 S.W.3d 154 (Mo.App. W.D.2002). The *Ballenger*

court analyzed a defendant's relationship to an anhydrous ammonia tank, found no contact, and simply stated physical contact with the tank would have been that "something more than mere preparation" to demonstrate the defendant was attempting to steal the contents under those facts. *Id.* at 158.

*O'Brien* and *Ballenger* specifically involved the attempted manufacture of methamphetamine and depended upon an analysis of the facts, including the defendant's relationship to otherwise legal items or products. Analysis in this case, however, depends not only upon an examination of Defendant's relationship to otherwise legal items, i.e., cell phone and binoculars, but also as to Defendant's connection with the illegal actions of his cohort, who concealed his possession of a BB gun while approaching a person using an ATM machine. Therefore, the dissent would hold a jury could reasonably, and without speculation, conclude Defendant was acting as a lookout for his cohort who was attempting to commit a robbery. Neither analysis sufficiently examines the distinction between attempts to steal property in general and attempts to steal property from the intended victim's person.

An attempted robbery can occur without a defendant having actual "contact" with the intended victim. *See State v. Stewart,* 537 S.W.2d 579 (Mo.App.St.L.Dist.1976). Further, we are instructed by Wayne R. LaFave, 2 *Substantive Criminal Law* Section 11.4 (2d Ed.2003) that in various states where the "substantial step" analysis is employed, there are several instances where the corpus delecti has been established for an attempted robbery and the intended victim is unaware of the pending attempt. For example, when a defendant is lying in wait, searching for or following the contemplated victim of the crime, or when a defendant is in possession of mate-rials to be employed in the commission of the crime "which are specifically designed for such unlawful use or which serve no lawful purpose of the actor under the circumstances," courts have found a defendant to be guilty of attempted robbery. *Id.* at 227–28.

Relying on the above rationale in this case, I agree there would be sufficient evidence upon which to convict Defendant's cohort of attempted robbery, and so too Defendant of aiding and abetting, if there was "something more" present, not merely contact with a victim. Yet, even in *Stewart* the victim was identifiable, and it was not clear from the opinion whether someone from the victim Bank or Courier Service did or did not testify to the unwanted action of that defendant. *Stewart,* 537 S.W.2d at 581. Here, the complete absence of the victim necessitates "something more" to fill the void.

Although it need not be established that the intended victim was aware of the conduct towards him or her, a victim called to testify would establish whether he or she was in fact within the vicinity of the crime scene, and any such conduct or contact by a defendant or cohort would have been unwanted. Furthermore, some evidence of a pattern of conduct, common scheme or plan by a defendant may obviate the need that a specific victim be produced to establish an attempt. There could even be testimony about an unidentifiable victim, seen screaming and fleeing the scene, which indicates a lack of consent to the actions of Defendant and his cohort. Indeed, I can find no Missouri case wherein the victim was completely unidentifiable.

In short, the "something more" can be something other than "contact" with a victim. What constitutes "something more" will vary based upon the circumstances of each case. This "something more" also differs from what would be required to

establish intended asportation of an inanimate object as opposed to taking property directly from an individual. In my opinion, the "something more" is missing here. Therefore, I concur in result only.

ROBERT G. DOWD, JR., Judge, dissenting.

I concur in Judge Hoff's opinion as to Points I, II, and IV. I respectfully dissent from Judge Hoff's opinion as to Point III. I believe Defendant has failed to meet his burden under plain error review that the evidence was insufficient to prove Defendant, acting through his accomplice, had the purpose to commit robbery in the first degree or took a substantial step in the commission of robbery in the first degree. I would therefore affirm Defendant's conviction for attempted robbery in the first degree.

The facts as found by the jury are as follows: At about 6:00 p.m. on December 4, 2000, Officer Michael Youngblood of the St. Louis County Police Department began observing the Bank of America ATM at 1200 Fern Ridge Parkway. Officers knew that customers had been victims of armed robberies at that ATM, and the officers had been provided with descriptions from the victims and photographs made from ATM surveillance tapes of potential suspects. Officers Youngblood and Koeller watched the area from an unmarked car, and they communicated by radio with other officers who also surveyed the scene.

At about 7:15 p.m., Officer Thomas Taylor radioed Officer Youngblood and said that he saw a silver Tahoe pass him several times, drive southbound, then drive northbound and onto a dead-end street. The Tahoe was missing a front license plate and appeared to have two occupants. Several seconds later, the Tahoe parked in the lot across the street from Officer Youngblood. Then, the Tahoe drove out of the lot and pulled in front of the bank building. The Tahoe's passenger, William Tabb, got out of the vehicle and walked around the side of the building. The driver, Defendant, exited onto Fern Ridge Parkway, then pulled into a parking lot off a dead-end section of Capistrano Street near Town & Four Parkway. From this location the ATM was plainly visible.

Officer Youngblood momentarily lost sight of Tabb as Tabb walked around the building. Soon thereafter, however, he saw Tabb walk from the back of the building, cross the Bank of America parking lot, and approach a car at the ATM. As Officer Youngblood was watching him, Tabb appeared to be talking on a cellular telephone. Officer Youngblood testified, "When the vehicle started to drive away, [Tabb] started walking across Fern Ridge. When the vehicle was out of sight, he began running back to the building here." Officers Youngblood and Koeller thought that Tabb might have spotted them, so they informed police that Tabb was fleeing the scene.

Meanwhile, Officer Brad Kelling, who was also conducting surveillance at the ATM, received a radio dispatch regarding two suspects on either side of Olive Street. Officer Kelling planned to arrest the suspect who had been in some bushes observing the ATM and who matched the description of a previous robbery suspect. Thereafter, Officer Kelling found Tabb by some bushes and arrested him. Tabb had a pellet gun in the sleeve of his coat, which to Officer Kelling looked and felt like a real pistol.

As officers arrested Tabb, Officer Taylor turned onto the dead end of Capistrano Street in an attempt to catch the Tahoe, driven by defendant. The Tahoe backed out of a parking space and drove towards the officer; Officer Taylor stopped his car, and Defendant also stopped. Officer Tay-

lor saw Defendant talking on a cellular phone. The officer ordered Defendant out of his car, and as Defendant exited, the cellular phone fell to the ground. Officer Thomas looked inside the Tahoe and saw a pair of binoculars. He also took the number from the rear license plate.

Officer Youngblood seized Tabb's cellular phone. After police had obtained the phones from both Defendant and Tabb, Officer Youngblood determined the last number called from Tabb's phone and called that number. Defendant's phone rang.

Defendant cites *State v. Ballenger*, 72 S.W.3d 154 (Mo.App. W.D.2002) to support his argument that there was insufficient evidence to prove attempted robbery in the first degree. *Ballenger* involved the attempted stealing of anhydrous ammonia, a liquid used as a source of nitrogen to grow crops, from a farm tank. It is also used as an ingredient in the manufacture of methamphetamine. In finding insufficient evidence to uphold Defendant's conviction for attempted stealing, the court in *Ballenger* concluded "the only conduct which occurred in this case was one individual leaving the truck momentarily, shining a flashlight on the anhydrous ammonia tank, and then getting back in the truck and driving away." *Id.* at 158. The court held this conduct by itself did not constitute a "substantial step." *Id.*

Unlike the facts in *Ballenger* where the suspect voluntarily withdrew from the tank after shining a flashlight on it, here Defendant (through his accomplice, Tabb) withdrew from the commission of the robbery only after the car with the intended victim drove away. Further, in our case Tabb fled from the scene and was later found hiding in the bushes, behavior consistent with guilt. In our case, there was evidence of planning including, the discovery of cell phones and binoculars, the presence of a getaway driver, surveillance of the crime scene, flight from the crime scene, hiding to evade police, and discovery of a gun in Tabb's sleeve.

I believe the case of *State v. Stewart*, 537 S.W.2d 579 (Mo.App.1976) is more factually similar to our case. In *Stewart* a defendant and three accomplices planned to rob a courier as he left a bank with payroll money. The suspects armed themselves, took their assigned positions approximately sixty feet from the bank, and as the courier left the bank the police, who were conducting a surveillance of the bank based on information of a possible robbery attempt, intervened and arrested the four men. On appeal, defendant argued that despite evidence of prolonged planning and preparation, there was no overt act sufficient to constitute attempted robbery. The court held that,

> [W]hen the four men drove to the bank, alit and took up their assigned positions, then being armed, ready, willing and able to intercept, assault and rob the courier, they had then gone beyond mere preparation. This conduct, under the principles announced in [*State v. Thomas*, 438 S.W.2d 441 (Mo.1969) ] was 'an act towards the doing, sufficient, both in magnitude and in proximity to the fact intended, to be taken cognizance of by the law . . . .'

The court further held the evidence was sufficient for attempted robbery in the first degree despite the fact there was neither confrontation with the victim nor the threatened use or display of a deadly weapon.

Instructive also is the section on attempt in LaFave and Scott's treatise *Criminal Law*. LaFave and Scott argue that the Model Penal Code approach to attempt places the emphasis on what the defendant has already done rather on what remains to be done.

The Comment to Section 564.011.1, RSMo 2000 (Inchoate Offense; Attempt), echoes the arguments made by LaFave and Scott when they discuss acts potentially constituting a "substantial step":

> These criteria are a matter of degree, but the basis for the indicative nature of the "substantial step" shifts the emphasis from what has yet to be done to what has already been done. The fact that further major steps must be taken by the actor to complete the offense attempted does not render an act insubstantial. However, the "substantial step" is merely part of the evidence required to go to the jury on the question of purposive conduct.

\* \* \*

The policy reason underlying the shift in emphasis from what has yet to be done to what has been done, as stated in the Model Penal Code, is that the law is not interested merely in punishing dangerous acts, but also in neutralizing dangerous individuals. **Thus subsection 1 represents a shift in the emphasis of Missouri law to the extent that conduct may suffice for an attempt though not coming as close to the actual commission of the offense as present Missouri law often requires.**[1] [Emphasis added.]

In contrast to the approaches to attempt articulated above in *Criminal Law* and in the Comment to Section 564.011.1, Defendant's argument is consistent with the "physical proximity approach." Defendant argues that through the actions of Tabb he "did not do anything or touch anybody. The act of walking towards the vehicle and then retreating is not strongly corroborative of Tabb's purpose to complete the offense and forcibly steal property from an occupant of the vehicle." This position is contrary to both the Model Penal Code and to the "substantial step" approach Missouri has adopted. As we have held in *Stewart,* neither a confrontation with a victim nor a last proximate act is necessary to prove attempted robbery. Defendant's approach would have police officers in similar situations wait until the victim is in physical peril before a valid arrest for attempted robbery could be made. Such a result would be both legally and practically unacceptable.

As it may apply to Point III, I would also find no merit to Point V. In Point V, Defendant alleges the trial court plainly erred in allowing the State to elicit testimony from Officer Taylor that, when arrested, Defendant did not ask why he was under arrest. Relying on *State v. Graves,* 27 S.W.3d 806, 810 (Mo.App. W.D.2000), Defendant argues the testimony was an improper use of post-arrest silence as affirmative proof of his guilt. In *Graves,* the state referenced defendant's post-arrest silence in its opening statement, on direct examination during its case in chief, and in closing argument. *Id.* at 809. The court determined that these references were improper, because there had been no evidence of a defense introduced by the defendant that could be impeached by her silence. *Id.* at 811. The State used defendant's post-arrest silence, therefore, not as impeachment but as affirmative proof of her guilt in violation of her Fifth Amendment rights. *Id.* The court, nevertheless, declined to reverse the conviction because there was overwhelming evidence of guilt. *Id.* at 812.

Plain error review involves a two-step process. *State v. Scurlock,* 998 S.W.2d 578, 586 (Mo.App. W.D.1999). First, we determine whether the claim for review

---

**1.** We note that *Stewart* was decided prior to the 1973 Proposed Code where the standard for proving attempt was significantly higher than that in the post-code change. The 1973 Proposed Code became effective on January 1, 1979.

"facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted.'" *Id.; State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995). If we find plain error on the face of the claim, we may, at our discretion, undertake the second step: determining whether the claimed error actually resulted in manifest injustice or miscarriage of justice. *Scurlock,* 998 S.W.2d at 586. Manifest injustice depends on the facts and circumstances of the particular case. *State v. Zindel,* 918 S.W.2d 239, 241 (Mo. banc 1996). "When guilt is established by overwhelming evidence no injustice or miscarriage of justice will result from the refusal to invoke the rule." *State v. Jordan,* 627 S.W.2d 290, 293 (Mo. banc 1982).

Even if, as Defendant argues, error exists, there was overwhelming evidence of guilt established by police eyewitness testimony relating the crime as it unfolded. Thus Officer Taylor's testimony did not cause Defendant to suffer manifest injustice and any error in the State's use of Defendant's silence was not plain error.