**STATE of Missouri, Plaintiff–Respondent,**

v.

**Katherine HERD, Defendant–Appellant.**

**No. 26900.**

Missouri Court of Appeals, Southern District, Division Two.

April 25, 2006.

Thomas D. Carver, Springfield, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Victor J. Melenbrink, Assistant Attorney General, Jefferson City, for Respondent.

PHILLIP R. GARRISON, Judge.

Katherine Herd ("Defendant") was convicted of the class C felony of stealing, a violation of Section 570.030.[1] She appeals, contending that there was insufficient evidence to support the conviction. We disagree and affirm.

Viewed in the light most favorable to the verdict, the evidence adduced at trial showed the following: John Edward Hawks ("John") and Marilyn Kay Hawks ("Marilyn") (collectively referred to as "the Hawks"),[2] own and operate a grocery store in Chadwick, Missouri, known as Kay's Country Store ("the store"). From 2000 to 2001, the Hawks experienced difficulty paying the bills for the store. While the store's gross sales were growing, its gross profits were decreasing. After discussing these losses with their certified public accountant, the Hawks began to suspect that someone was stealing from the store, and Marilyn decided to go over her employees' recent cash register tapes to see if she could find a discrepancy.[3]

Marilyn examined the cash register tapes of Defendant, and she immediately noticed a $50 "void." When a cashier has mistakenly entered a transaction she may correct the error by "voiding" out the mistake and re-entering the correct sale. This process ensures that the cash register tape reflects the actual amount of the sales which occurred during that shift. Marilyn found this particular void strange because it was not accompanied by a mistakenly entered transaction for the same amount. A "void" entry such as this would make the final total sales recorded on the cash register tape reflect less (in this instance $50 less) than the amount of actual money in the cash register, thus making the cash register drawer "over" by the same amount as the voids. Marilyn then reviewed ten cash register tapes belonging to Defendant, all of which contained these types of unexplained voids.

The Hawks contacted the Christian County Sheriff's Office and reported their findings. Officer Jeannie Priebe ("Officer Priebe") began investigating the allegations, collecting the cash register tapes, miscellaneous pieces of paper, and videotapes of Defendant taken during her shifts. Officer Priebe also conducted her own video surveillance of Defendant while she worked her shift on June 30, 2001. That day she observed Defendant making transactions on her cash register with no customers present, but yet the cash register drawer was being opened and closed. At approximately 8:00 p.m., Officer Priebe observed Defendant remove the housing lid of the cash register tape, unroll the cash register tape, read from it, roll it back up, place the housing back on the cash register, and key in a transaction on her cash register pad, again without a customer being present.

---

1. All references to statutes are to RSMo (2000) unless otherwise indicated.

2. We use the first names of the victims for clarity.

3. At the end of every shift, each employee removes their cash register tape, which lists every item sold on that shift. The employee initials and dates the receipt, and puts it along with the cash, checks, credit card receipts, and food stamp vouchers in a bank bag, which is then given to Marilyn. This allows Marilyn to make sure the cash register tape matches the actual cash, checks, credit card receipts, and food stamp vouchers in the drawer after each shift.

Officer Priebe later observed Defendant open the cash register drawer to begin closing out the cash register. She saw Defendant take out the coin tray from the cash register drawer, remove the credit card receipts, and sort the money by groupings. Officer Priebe watched as Defendant took one bill from each of the $50, $20, $10 and $5 stacks, and placed them in a separate stack, before placing the remaining stacks of bills in a deposit bag. Defendant then placed the separate stack of bills "in front" of the cash in the bag, distinctly keeping it apart from the others. She then took the deposit bag to the back room of the store, where Officer Priebe, while watching from another camera, observed Defendant put her hand in the bag and then put her hand in her pocket.

At that point, Officer Priebe and another officer entered the store, told Defendant she was under arrest and asked her to remove her hands from her pockets. Defendant complied and laid $85 on the counter; one $50 bill, one $20 bill, one $10 bill, and one $5 dollar bill. At the time of the arrest, Defendant stated to the officers, "I was going to put it back." Defendant also stated that "it's not what it looks like," and that she "was going to buy change."

Defendant's cash register tapes from that shift contained voids with no accompanying mistaken transactions in the amounts of $51.25, $20.50 and $13.36, which total $85.11.[4] Because she voided out transactions that never took place, the amount of money in Defendant's cash register drawer should have been $85.11 more than was reflected as the total sales on her cash register tape. However, when Marilyn balanced the cash register drawer with Defendant's cash register tape, the drawer

was $1.95 under the amount on the tape,[5] signaling that approximately $85 in cash had been taken from the cash register.

Marilyn estimated that, based upon her examination of Defendant's ten cash register tapes and the "voids" that appear thereon, Defendant had taken approximately $80 per shift. Given that Defendant regularly works three days per week, from June 1, 2000, to June 30, 2001, Marilyn estimated that she had taken approximately $12,000. The State hired Joseph Page ("Page"), a certified public accountant and fraud examiner, to examine all of the cash register tapes from all of the store's employees, from January 1 to June 30, 2001, in order to find any irregularities. Page examined the cash register tapes for voids that had no obvious explanation, such as a preceding mistaken transaction. He concluded that Defendant's cash register tapes, which were identified by her initials, averaged $76.57 in unexplained voids, while her co-workers averaged only $5 per shift. He estimated that from January 1 to June 30, 2001, Defendant's cash register tapes contained between $5,582.46 and $2,446.82 in unexplained voids.

Based upon the facts as described above, a jury found Defendant guilty of felony stealing. Defendant filed a motion for new trial, which was overruled, and she was sentenced to three years in the department of corrections. She now appeals, contending that the trial court erred in that there was insufficient evidence to establish that at least $750 was taken from the Hawks or that she took property from them with the intention of permanently depriving them of it.

4. Cash register tapes from Defendant's shifts on June 16, 17 and 21, 2001, all contained similar unexplained voids.

5. It is not unusual for the cash register drawer to be off by one or two dollars per shift due to small accounting mistakes.

In reviewing a conviction for sufficiency of the evidence, we are limited to determining whether there was sufficient evidence from which a reasonable juror might have found Defendant guilty beyond a reasonable doubt. *State v. Boyd*, 91 S.W.3d 727, 733 (Mo.App. S.D.2002). We do not act as a "super-juror with veto powers over the jury, but instead, give great deference to the trier of fact." *Id.* We accept as true all evidence favorable to the verdict, and all reasonable inferences drawn therefrom, while disregarding all evidence and inferences to the contrary. *Id.* It is for the jury to determine the credibility of the witnesses. *State v. Shockley*, 98 S.W.3d 885, 890 (Mo.App. S.D.2003).

In order to be convicted of the class C felony of stealing under Section 570.030, one must: 1) appropriate the property of another, 2) which has a value of at least $750,[6] 3) with the purpose of depriving him thereof, and 4) without his consent or by means of deceit or coercion. *See State v. Presberry*, 128 S.W.3d 80, 91 (Mo.App. E.D.2003).

Defendant first argues that there was insufficient evidence to support the jury finding that she had taken at least $750 from the Hawks. She relies on *Woolford v. State*, 58 S.W.3d 87 (Mo.App. E.D. 2001), in arguing that the State failed to adequately prove the value of the property Defendant was alleged to have misappropriated. She contends that the testimony of Page and Marilyn only provided an estimated range of value (from $12,000 to $18,000 in Marilyn's case, and $5,582.46 to $2,446.82 in Page's case) and therefore was not substantial proof of value.

In *Woolford*, the eastern district of this court reversed a conviction under the same statute at issue here because the State failed to provide substantial evidence of the value of the property that was stolen. 58 S.W.3d at 89. When asked if the value of the stolen property exceeded $750, the owner in *Woolford* responded:

> Probably, yeah. I don't know the value of those old watches. I don't know the value—I would guess that would be a fair approximation.

*Id.*

In this case, Marilyn testified that after her examination of ten of Defendant's cash register tapes she estimated that Defendant was stealing approximately $80 per shift and that number, multiplied by the number of shifts she worked from June 2000 through June 2001, was approximately $12,000. Defendant points out that Marilyn, during a deposition, also testified that Defendant stole $18,000. However, the State reminds us that simply because a property owner has valued property differently on separate occasions does not necessarily demonstrate a lack of sufficient evidence of an essential element of felony stealing. *See State v. Tivis*, 948 S.W.2d 690, 694 (Mo.App. W.D.1997).

This is a different factual scenario than was present in *Woolford* in which the owner was admittedly guessing as to the value of the property. Furthermore, Page testified that his review of Defendant's cash register tapes from January through June 2001 (half the time that Marilyn reviewed) showed that those cash register tapes contained between $5,582.46 to $2,446.82 in unexplained voids.

This is not a situation in which the conviction was "based on the uncorroborated

---

**6.** In 2002, the General Assembly amended Section 570.030.3(1) to lower the value amount to $500. However, the events giving rise to Defendant's conviction occurred between 2000 and 2001.

testimony of a single witness" that was so "indefinite ... that it would be unsafe to rest a conviction thereon." *Woolford*, 58 S.W.3d at 90 (quoting 23 C.J.S. Criminal Law § 1097). In this case two witnesses examined a number of Defendant's cash register tapes. They analyzed and totaled the number of voids that were not accompanied by a transaction that was in need of correction and came to the conclusions they testified to. Simply because the sum of their testimony did not result in one concrete number does not render their testimony to be based upon "mere probabilities and speculation." *Woolford*, 58 S.W.3d at 90.

Defendant also points out that Page testified that he could not say with any degree of certainty that Defendant had taken any cash during the time period for which he analyzed her cash register tapes. Therefore, Defendant argues, the only substantial evidence that she took any money occurred on the day of her arrest, which only pertained to the $85 she had in her possession at the time. We disagree.

There was significant circumstantial evidence that Defendant had been entering illegitimate voids to hide the fact that she was taking cash out of the cash register for at least six months (the time period which Page analyzed). Evidence was presented that there were unexplained voids present on Defendant's cash register tape from the day of her arrest, June 30, 2001, which totaled almost the exact amount (a difference of eleven cents) as the amount of cash found in Defendant's pocket when she was arrested. From this evidence a reasonable juror could infer, as the State argued, that Defendant used this method of entering "voids" without any corresponding erroneous transaction, in order to allow her to take that amount of cash from the cash register drawer without arousing suspicion from the Hawks, because the remaining cash in the cash register drawer would be the same as the total reflected on the cash register tape.

This evidence, in conjunction with Marilyn's testimony that the store was missing money and Page's testimony that an unusually large number of unexplained voids appeared on Defendant's cash register tapes over a period of six months, was strong circumstantial evidence that Defendant was stealing from the Hawks throughout that period. Circumstantial evidence can be afforded the same weight as direct evidence. *State v. Hutchison*, 957 S.W.2d 757, 767 (Mo. banc 1997). Accordingly, this portion of Defendant's point is denied.

Defendant next argues that the State failed to show that Defendant took the $85 from the register with the intention of depriving them of it. However, this is strictly an issue of witness credibility. Evidence was presented on both sides as to whether there could have been a legitimate explanation for Defendant having the cash in her pocket at the time of her arrest. However, it was reasonable to infer that she intended to keep the money. It is for the jury to decide the credibility, reliability and weight to be given to the witnesses' testimony. *Shockley*, 98 S.W.3d at 890. Accordingly, this portion of Defendant's point is also denied.

Because there was sufficient evidence to support the jury's verdict, the Defendant's conviction is affirmed.

BATES, C.J., and SHRUM, P.J., concur.