**STATE of Missouri, Respondent,**

v.

**Robert CUMMINGS, Appellant.**

No. SD 32055.

Missouri Court of Appeals,
Southern District,
Division One.

May 16, 2013.

Craig A. Johnston, of Columbia, MO, for Appellant.

Chris Koster, Attorney General and Daniel N. McPherson, Assistant Attorney General, of Jefferson City, MO, for Respondent.

WILLIAM W. FRANCIS, JR., J.

Robert Cummings ("Cummings") appeals the trial court's judgment convicting him of the class A felony of first degree assault (Count I), in violation of section 565.050;[1] the unclassified felony of armed criminal action (Count II), in violation of section 571.015; the class B felony of first degree assault (Count III), in violation of section 565.050; and the unclassified felony of armed criminal action (Count IV), in violation of section 571.015. Finding no merit to Cummings' claims, we affirm the judgment and sentence of the trial court.

### Facts and Procedural Background

Cummings does not contest the sufficiency of the evidence to support his convictions. Accordingly, we set forth only those facts necessary to address Cummings' points. In doing so, we view the evidence in the light most favorable to the

---

1. All references to statutes are to RSMo 2000, unless otherwise indicated.

jury's verdict. *See State v. Newberry,* 157 S.W.3d 387, 390 (Mo.App. S.D.2005).

The evidence at trial showed that on the evening of March 15, 2005, Cummings was in a Springfield strip club and bar called Kristy's Cabaret (the "club"). Kristina Kelley ("Kelley") was general manager of the club and was training a new waitress, Pamela Capps ("Capps"), as it was Capps' first evening on the job.[2] Capps testified she remembered serving the "shooter" one beer. She described him as "quiet" and he seemed to be "irritated" by her when she would ask if he needed another beer. Per the law, the club had to stop serving alcohol at 1:30 a.m. Last call was announced a few minutes prior to that time, and the waitresses began collecting unfinished drinks from the customers.

Capps tried to collect Cummings' beer but he refused and told her "not to touch his 'F-ing' beer." Capps told Kelley, and Kelley indicated she would take care of the problem. After Capps left, Kelley saw Cummings go to the restroom. Kelley approached the table while Cummings was gone, told his companion she had to take the drink, removed the glass, and took it behind the bar where she emptied it.

When Cummings returned to his table and found his beer gone, he approached the bar and wanted to buy another beer. When Kelley explained the law prevented her from serving alcohol after 1:30 a.m. and refused to serve him, Cummings threatened to call "Liquor Control and the DEA" to get Kelley in trouble for refusing to serve him.

A customer who was standing nearby, Christopher Allen Brown ("Brown"),[3] first tried to defuse the situation. Brown and Aaron Linder ("Linder") had been at the club all evening and had eight to ten beers while sitting at the bar. Brown denied being intoxicated and testified he had a clear recollection of the events that night. When Cummings continued his tirade, Brown reached into his pocket and pulled out some change. Brown handed the money to Cummings and told him to "call somebody that give[s] a damn." Cummings reached into his pocket, pulled out a small caliber handgun, and fired three shots at Brown hitting him in the abdomen and the hand. Kelley and Capps crawled underneath the bar sink and Kelley grabbed a phone and called 911. As Cummings walked out of the bar, Jimmy Vanzandt ("Vanzandt") said "Hey," while pointing his finger at Cummings and Cummings then shot Vanzandt through the finger, into his chest, with one shot.

Brown underwent surgery which revealed an injury to his colon that necessitated the removal of part of the small intestine. The bullets were left in the abdomen as they had penetrated the muscles and tissues of the back so they were "statistically ... best left in place[,]" but could be removed later if they caused problems. Vanzandt was shot in the chest and also wounded in the left index finger. Vanzandt was fortunate the bullets did not penetrate his rib cage and enter into his chest where they could have hit any number of major organs or blood vessels.

Police recovered four .22–caliber "short" shell casings from the club. The club had a digital video recorder which recorded the shootings inside the club.

---

2. By the time of trial, Kelley was going by the last name of "Clossin" and Capps by the last name of "Stevens." We will use the names they were going by on the day of the charged crimes.

3. Brown goes by "Allen" and is referred to by both his first and middle names in the transcript.

On March 16, 2005, Detective Brian Crum ("Detective Crum"), a task force officer with the Bureau of Alcohol, Tobacco, and Firearms, was assigned to the follow-up investigation. Cummings had already been identified as a potential suspect from the initial investigation. As a part of his follow-up investigation, Crum obtained a photograph (State's Exhibit 39A), which he believed depicted Cummings. Detective Crum showed the photograph to Kelley who identified the person depicted in the photograph as the shooter. Detective Crum used Kelley's identification to obtain a warrant and Cummings was then arrested on the evening of March 16, 2005.

After Cummings was arrested, Detective Crum obtained the Cummings' booking photo to use for photographic lineups. Capps, Vanzandt and Linder all identified Cummings from a photo lineup that contained Cummings' booking photo. Also, Kelley, Capps, Vanzandt and Linder all made an in-court identification of Cummings.

Cummings was charged by amended information as a persistent offender with the class A felony of assault in the first degree (Count I), in violation of section 565.050, for attempting to kill or cause serious physical injury to Brown; the class B felony of assault in the first degree (Count III), in violation of section 565.060, for attempting to kill or cause serious physical injury to Vanzandt; and two counts of the unclassified felony of armed criminal action (Counts II and IV), in violation of section 571.015.

A jury trial was held on March 5, 2012.[4] The first witness to testify for the State was Kelley, the manager of the club, who was tending bar when the shootings occurred. Kelley described the shooter as "[a]n older gentleman, wearing glasses and a ball cap[,]" he had a "medium beard[,]" and walked with a limp.

Kelley testified the club had a video surveillance system. The videotape was admitted in evidence and played for the jury. Kelley identified from the video the various persons involved in the shooting, including the man who did the shooting.

Kelley testified that several days after the shootings, Detective Crum showed her a photograph and asked if she recognized the person depicted in the photo. The photograph was admitted into evidence over Cummings' objection. Kelley testified without objection that the person in the photo was the man who committed the shootings. The photograph was displayed to the jury without objection. Kelley also testified she identified the shooter from a second array of photographs Detective Crum showed her. Kelley then identified for the jury that the person who did the shooting was sitting at the defense table in khaki pants and eyeglasses.

Capps, called as a witness by the State, testified she saw Brown get shot and heard five or six more shots while she was under the bar. She described the shooter, at the time of the shooting, as being "scruffy-looking and kind of blondish … gray." Capps testified she remembered talking to the police after the shooting. She also recalled speaking to Detective Crum a couple of months after the shooting and picking Cummings out of a photo lineup. Capps also identified Cummings in the courtroom as the shooter.

Brown testified he was unable to speak to the police after the shooting because he

4. The delay in Cummings' trial was due to being found incompetent to stand trial from June 13, 2006, until July 19, 2011.

was transported to the hospital due to his life-threatening injuries. At trial, Brown identified Cummings as the customer and the person who shot him, but only because he was told by law enforcement that Cummings was the man they arrested.

Linder testified he and Brown had gone to the club to have a couple of beers and he saw Brown get shot. They both were sitting at the bar at the time of the shooting. Linder testified he remembered "the whole event," and testified to what he remembered.

Linder testified that several months after the shooting, he and Brown went to the police department at the request of Detective Crum to look at a photo lineup. He was able to pick Cummings out of the lineup. Linder also identified Cummings in the courtroom as being the shooter. Linder testified that at the time of the shooting, Cummings had a "shorter beard" and he was 100 percent sure Cummings was the shooter.

Shooting victim Vanzandt also testified at trial. On direct examination, Vanzandt was questioned about the time he arrived at the club on the night of the shooting. Vanzandt testified he arrived at the club around 11:30 p.m., as he had just gotten off work at 11:00 p.m. He was further questioned about the time the shooting happened and testified, "It was right after work. I'm not sure if I had to work over that night or not. You know, sometimes I did; sometimes I didn't. And to be honest with you, it's been almost seven years ago so, honestly, I don't know for sure."

When asked whether he was drinking the day he got shot, Vanzandt testified, "No." Vanzandt went on to testify he heard the argument between Cummings and Kelley as he walked into the club, and the shooting happened shortly thereafter. The prosecutor continued to question Vanzandt on his testimony that he arrived at the club at 11:30 p.m., and that the shooting happened when the club was getting ready to close around 1:00 a.m. Vanzandt testified he was not sure if the club was getting ready to close, but assumed it was because he was asked to carry out some trash.

On cross-examination, defense counsel played a longer version of the surveillance video, which showed Vanzandt drinking at 12:05 a.m. The time stamp on the tape also indicated that the shootings happened around 1:31 a.m. Vanzandt then agreed that he was at the club about an hour and a half before the shootings. Counsel also cross examined Vanzandt about his testimony at a preliminary hearing two months after the shootings and his deposition testimony where he stated he had only been at the club five minutes before the shootings. Vanzandt testified he must have forgotten and again noted that it had been seven years since the shootings. Counsel continued to go through the videotape pointing out the discrepancies between Vanzandt's preliminary hearing testimony and the surveillance video. After viewing the surveillance video, Vanzandt admitted that any testimony he gave about not drinking that night was not true.

The State noted on redirect that defense counsel skipped ahead on the video and asked Vanzandt if he knew whether it showed him sipping from the same drink or from several drinks. Vanzandt testified he did not know, adding that a blood test at the hospital came back negative so he could not have had much to drink. The State asked Vanzandt if he would be surprised that the test conducted at the hospital showed there was alcohol in his blood. Vanzandt said he would be surprised if it was a high content. He denied being drunk that night and said the alcohol he did consume did not impair his ability to perceive what was happening.

The State then asked Vanzandt about the discrepancies in his testimony:

Q. When you previously testified that you didn't think you were drinking or that you weren't drinking, were you lying?

A. Honestly, it looks like I was. It wasn't intentional. I guess I didn't remember it because I know I wasn't drunk.

Q. I guess that's where I am confused. Did you intend to deceive anyone by answering the question that you—

A. No, ma'am. I did not.

Q. So you say you weren't intentionally lying?

A. No, ma'am. I sure wasn't.

Q. So, when you testified previously, did you testify in a manner that was consistent with your best recollection—

A. Yes, ma'am.

Q.—doing the best you can?

Same thing. When you said that you thought you got to the bar around 11:30, were you 100 percent sure it was at 11:30?

A. No. Like I said, I didn't know if I got—sometimes I worked over. My normal shift was from three to eleven. Sometimes I worked sixteen hours; some days I worked twelve hours.

Q. So, if you had to work over, you could have gotten to the bar later than 11:30?

A. Right.

Q. Did you ever intend to mislead anyone about what time you got to the bar?

A. No.

Q. Did you have any reason to lie about it?

A. No reason to lie about it, no.

Q. On the video, [Defense Counsel] said: Well, this shows you were in the bar at 12:06. Is that inconsistent with when you said you thought you got there around 11:30? I mean, you've always acknowledged you were in the bar at 12:06?

A. Right, that's correct.

Q. Can we tell from the video whether you were in the bar at 11:30?

A. Not unless we've got video that goes back that far.

Vanzandt also testified his recollection about the shootings happening shortly after he walked into the bar was not entirely inaccurate because it happened shortly after he returned from taking boxes to the dumpster behind the building.

After the jury was excused for the evening, defense counsel moved for a mistrial based on prosecutorial misconduct in that it was his belief the State had violated "Rule 3.3, Candor Toward the Tribunal," by calling Vanzandt "knowing he was going to commit perjury." The testimony in question involved what time Vanzandt arrived at the club and how much he had to drink.

The State responded that Vanzandt had not committed perjury, but testified to what he believed the truth to be. The trial court stated it was obvious Vanzandt's testimony "was inconsistent," but Vanzandt "was not inconsistent about the main issues, was he shot and who shot him." The trial court overruled the motion.

The following day, Vanzandt left a voice mail message for the State, which was retrieved while the trial was recessed for lunch. In that voice mail, Vanzandt said that he had lied about how much he had drank and how long he had been in the bar. Vanzandt said he first told those lies at the preliminary hearing because he was on probation and did not want to get in

trouble. The State called Vanzandt and told him he needed to return to court. The State also gave defense counsel the opportunity to listen to the voice mail message.

Defense counsel renewed the motion for mistrial based on the argument that Vanzandt had committed perjury and that the perjury went to a material fact, namely Vanzandt's credibility. Counsel also argued that how much Vanzandt had to drink that night went to his ability to perceive the events. The trial court noted counsel spent 30–50 minutes cross examining Vanzandt to show he was lying and that the jury had picked up that his testimony about not drinking was untrue since the video showed he was drinking. The trial court found Vanzandt's credibility was not material on the issues of whether he was shot and who shot him, and that how much he had to drink went to his ability to observe, which was a jury issue. The trial court also pointed out that defense counsel knew that Vanzandt was lying when he gave his deposition and before he took the witness stand. The trial court stated that it would not declare a mistrial.

Vanzandt was recalled to the stand and admitted his testimony about how long he was at the club and whether he had anything to drink was untruthful. Vanzandt admitted to having three or four beers at the club.

The State then called the surgeon who operated on Vanzandt and elicited testimony that Vanzandt had been diagnosed on admission with "acute alcohol intoxication." The doctor testified that diagnosis meant medical personnel were suspicious that Vanzandt had alcohol in his system. He said it was not the same thing as alcohol poisoning. The doctor testified a blood alcohol test conducted at 2:46 a.m. showed

a level of 66 milligrams per deciliter and that he would expect to see very little impairment in a person with that blood alcohol level.

Detective Crum also testified at trial. Detective Crum testified that Cummings had already been identified as a potential suspect when he received the assignment:

Q. Did you follow up on that potential suspect?

A. Yes, I did.

Q. And, as part of that follow-up investigation, were you able to obtain a photograph of Robert Cummings?

A. Yes, I was.

Defense counsel objected to lack of foundation due to Detective Crum lacking personal knowledge that the person depicted in the photograph was Cummings. Counsel further argued that any foundation that could be laid would be based on hearsay since the photo was received from Cummings' girlfriend and Detective Crum did not have personal knowledge that the photograph was of Cummings. The trial court overruled the objection stating Detective Crum could testify he believed the photo, State's Exhibit No. 39A, to be of Cummings.[5]

The State continued its questioning of Detective Crum:

Q. Let me back up just a step to make sure that I don't miss anything. You said you did a follow-up investigation on Robert Cummings; is that correct?

A. Yes, ma'am.

Q. And, as part of that investigation, did you obtain a photograph that you believed depicted Robert Cummings?

A. Yes.

---

5. Defense counsel objected to the trial court's ruling arguing that Detective Crum's "belief" was based on hearsay. The trial court overruled this objection as well.

Q. I'll show you what's been marked and admitted as State's Exhibit 39A. I'm putting it up on the screen behind you so you can look at it. And tell the jury: Is that the photograph that you obtained that you believed was of Robert Cummings?

A. Yes.

Detective Crum went on to testify he showed the photograph to Kelley, who indicated the person in the photo was the shooter, Cummings. Detective Crum also testified that Kelley's identification led to the police being able to obtain an arrest warrant for Cummings, which in turn permitted them to obtain a booking photograph that could be used in the photo lineups viewed by the other witnesses.

Cummings did not testify, but did present testimony from a police officer who interviewed Kelley shortly after the shootings.

The jury returned its verdicts finding Cummings guilty on all counts.

Cummings filed a motion for new trial on March 20, 2012, alleging in part, trial court error in allowing Detective Crum to testify that the subject in State's Exhibit No. 39A was Cummings, overruling Cumming's request for mistrial for prosecutorial misconduct, and overruling Cumming's second request for mistrial regarding Vanzandt's admissions that he had given false testimony which amounted to perjury at Cummings' trial.

On May 14, 2012, the trial court denied the motion for new trial and sentenced Cummings as a prior and persistent offender to twenty years' imprisonment on each count. The sentences on Counts I and II were ordered to run concurrently to each other, as were the sentences on Counts III and IV. The sentences on Counts I and II were also ordered to run consecutively to the sentences on Counts III and IV, for a total of forty years' imprisonment. This appeal followed.

Cummings contends the trial court erred in: (1) overruling his requests for mistrial because Vanzandt's testimony was false, the State knew or reasonably should have known his testimony was false, failed to take corrective measures to correct the false testimony, and the false testimony likely affected the jury's judgment; and (2) in permitting Detective Crum to testify that the photograph he showed Kelley was a photograph of Cummings or someone Detective Crum believed to be Cummings. The State responds that: (1) the record does not demonstrate the State knew Vanzandt was deliberately giving false testimony, the subjects of the false testimony were not decisive on the question of guilt, and the jury was fully aware of the inconsistencies in Vanzandt's testimony and that he lied; and (2) Detective Crum's testimony regarding the photograph was admissible to explain Detective Crum's subsequent conduct in obtaining an arrest warrant and Cummings cannot show prejudice or manifest injustice from the testimony.

The issues presented for our determination are:

1. Whether the trial court abused its discretion in denying Cummings' requests for a mistrial due to victim Vanzandt's false testimony.

2. Whether the trial court abused its discretion in permitting Detective Crum to testify that the photograph he showed Kelley was a photograph of Cummings or someone Detective Crum believed to be Cummings.

### Point I: No Abuse of Discretion in Denial of Motion for Mistrial

Cummings claims in his first point that the trial court erred in overruling his motions for mistrial. Specifically, he con-

tends that a mistrial should have been granted for two reasons: (1) prosecutorial misconduct in violating "Rule 4–3.3 of the Missouri Rules of Professional Conduct" when the State elicited testimony from Vanzandt they knew was false regarding how long he had been at the crime scene and how much alcohol he had to drink; and (2) Vanzandt's testimony was perjured and there is a "reasonable likelihood his lies could have affected the judgment of the jury."

### Standard of Review

"Granting a mistrial is a drastic remedy that should be used only when necessary to cure grievous prejudice." *State v. Smith,* 944 S.W.2d 901, 917 (Mo. banc 1997). "The decision to overrule a motion for mistrial will not be overturned absent a finding that the trial court abused its discretion." *Id.* The trial court is in the best position to determine whether an incident had a prejudicial effect on the jury. *State v. Goff,* 129 S.W.3d 857, 866 (Mo. banc 2004). "An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State ex rel. Kemper v. Vincent,* 191 S.W.3d 45, 49 (Mo. banc 2006) (internal quotation and citation omitted).

### Analysis

In general, a conviction resulting from "the deliberate or conscious use by a prosecutor of perjured testimony violates due process and must be vacated." *State v. Mims,* 674 S.W.2d 536, 538 (Mo. banc 1984). To succeed on the theory that the State knowingly used perjured testimony, Cummings had the burden to prove that: "(1) the witness' testimony was false; (2) the state knew it was false; and (3) the

conviction was obtained as a result of the perjured testimony." *State v. Cummings,* 838 S.W.2d 4, 7 (Mo.App. W.D.1992). The third element required Cummings to demonstrate that Vanzandt's testimony was not only false, but that it was "perjured testimony." *State v. Albanese,* 9 S.W.3d 39, 50 (Mo.App. W.D.1999). Perjured testimony is testimony that is false *and* relates to a "material fact" in the case. *Id.* (citing § 575.040) (emphasis added). Section 575.040.2 identifies a material fact: "A fact is material, regardless of its admissibility under rules of evidence, if it could substantially affect, or did substantially affect, the course or outcome of the cause, matter or proceeding." § 575.040.2.

As to the first element, it does not appear either party is disputing that a portion of Vanzandt's testimony was false. Even though his testimony was partially false, Cummings did not meet his burden of showing the second and third elements.

The record does not indicate the State thought Vanzandt had committed perjury. In response to Cumming's first motion for mistrial, the State told the trial court that Vanzandt testified to what he thought happened and it was defense counsel's job to point out any inconsistencies in his testimony:

THE STATE: I don't think that that witness did commit perjury because perjury means that you come in here with the intention of lying to the Court. He testified that to his recollection he didn't have anything to drink on that night. Obviously, there's evidence to suggest otherwise. He later backtracked, said that he wasn't sure anymore, didn't know whether he had had any alcohol because, obviously, watching himself on the video consuming what appeared to be alcohol was inconsistent with that. And he talked about how he wouldn't be surprised to see that he had a positive

blood alcohol content, which I specifically asked him about that, about his blood alcohol content in the medical records.

I don't know why he doesn't remember drinking something on that night. Clearly, he doesn't. But I don't think there is anything to suggest that he was being untruthful. Witnesses testify all the time who have recollections that are different from previous statements they've made to law enforcement. And that's kind of one of the bread and butter items of defense counsel's work is to point out those type of inconsistencies.

So I don't think that there is any prosecutorial misconduct here because I don't think that he's committing perjury. And I don't think he perjured himself here on the stand today. He testified to what he believed that the truth was, which was his recollection was that he didn't have any alcohol.

■ "Inconsistent statements made prior to trial are not alone sufficient to establish that a witness has committed perjury." *Albanese,* 9 S.W.3d at 50. Rather, such statements go to the witness' credibility and can be used to cross examine the witness, which is exactly what took place here. Prior to Vanzandt's admission that he testified falsely, his testimony could be construed by the State as prior inconsistent statements to which Cummings' counsel was free to point out on cross-examination.

The record shows that when the State received Vanzandt's voicemail message on lunch recess that he gave false testimony, the State notified Cummings' counsel and the trial court. The trial court immediately went back on the record to discuss the issue.

■ In support of his argument on the second element that the State knowingly elicited and permitted Vanzandt's false testimony, Cummings points to the videotape evidence available to the State showing Vanzandt drinking, and the physician called by the State who testified to Vanzandt's alcohol intoxication diagnosis. However, this evidence was *equally available* to Cummings and his counsel, along with Vanzandt's previous sworn testimony from both the preliminary hearing and his deposition, which was also available to *both* Cummings and the State. This is not a scenario where the State elicited false testimony and had not provided the defense with the information or records to impeach the witness' false testimony. *See Taylor v. State,* 262 S.W.3d 231, 243 n. 7 (Mo. banc 2008) (citing *Napue v. Illinois,* 360 U.S. 264, 269–70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)) (witness falsely testified that witness had received no promise of consideration for his testimony, even though assistant state's attorney had promised witness consideration and the assistant state's attorney did not correct false testimony of witness). It is clear this evidence was available to Cummings because his counsel used the videotape and Vanzandt's previous testimony to impeach Vanzandt on cross-examination. In circumstances such as here, arguably the State was not required to correct the testimony because Cummings' counsel had the records to impeach and, in fact, did impeach Vanzandt's statements.

■ Finally, Cummings failed to meet his burden as to the third element and show that Vanzandt's false testimony was a "material fact" in that it substantially affected the outcome of the case. Vanzandt's testimony as to how long he was at the club prior to the shooting and how much alcohol he drank, was not essential to convicting Cummings of the charges against him, nor in reasonable likelihood,

affected the judgment of the jury.[6] The issue is whether Cummings was the shooter. As the trial court noted, Vanzandt's false testimony was not material as to whether he was shot and who shot him.

Here, there was plenty of other evidence besides Vanzandt's testimony to support a conviction. Vanzandt was one of three witnesses that identified Cummings as the shooter from a photo lineup, and one of four witnesses that made an in-court identification of Cummings.[7] The jury could have relied on and reached the same verdict based on any of the other eyewitness testimony identifying Cummings as the shooter.

Finally, and most importantly, the jury was without question made *keenly* aware that Vanzandt lied when he was recalled by the State the day after his original testimony. He testified as much when recalled by the State:

Q. Mr. Vanzandt, you previously testified in this jury trial already; is that right?

A. Yes, ma'am.

. . . .

Q. After you left and got finished testifying, did you make any additional contact with anyone at the prosecutor's office?

A. This morning.

Q. Why did you do that?

A. Because, when I left here last night, I realized that my testimony that I had made prior was false. And the reason I did that is because at the time I was on probation, and I didn't want to get in trouble for being in a bar after I got off work. And so I said then that, you know, I had only been at the bar five minutes and that I had not drank. And I did drink. I wasn't drunk by no means.

I called my probation officer the next morning and told her what happened. She said no big deal. I had a full-time job. I didn't have any dirty UAs. You know, my life had changed over other than the part of just drinking.

And, when I left here, I didn't want to feel like—I didn't want the jury to think that I'm a liar or that I was trying to hide anything. But now I am telling you all that this is why I said what I said. I left here yesterday—I've changed my life over. I go to church at Broadway Baptist. My life is completely turned around.

And I realize what I said may be detrimental to the case. And I wanted you all to know that I did lie about that. I'm sorry. You know, I had a conscience when I came home. And this morning it's like I got to do what's right. And whatever happens to me is, you know, that's my fault. But I am just trying to make it right now and tell the Judge that I'm sorry too.

Cummings' counsel had the opportunity to again cross examine Vanzandt and did point out that Vanzandt made false statements under oath to the jury and prior to the trial.

In light of the fact that Vanzandt came back the day after he testified and admit-

---

**6.** We have not found, nor have we been directed to, any cases establishing this line of testimony would affect the judgment of a jury deliberating on charges of felony first-degree assault and felony armed criminal action.

**7.** Capps, Vanzandt, and Linder all identified Cummings from a photo lineup that contained Cummings' booking photo. Also, Kelley, Capps, Vanzandt and Linder all made an in-court identification of Cummings.

ted to the jury that he made false statements under oath, we fail to see how one could assume the conviction was obtained as a result of his perjured testimony. The jury was made aware by Vanzandt *himself* that his original testimony regarding how long he was at the club before the shooting, and how much alcohol he drank, was false. Vanzandt's own admissions put the jury on notice that his testimony should be closely scrutinized. See *Albanese,* 9 S.W.3d at 49.

We cannot conclude the trial court's ruling was clearly against the logic of the circumstances and was so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration in denying Cummings' motion for mistrial. We find the trial court did not abuse its discretion in denying Cummings' requests for a mistrial due to Vanzandt's false testimony. Therefore, Cummings' Point I is denied.

### Point II: No Abuse of Discretion in Permitting Testimony Regarding Photograph

In his second point, Cummings alleges the trial court abused its discretion in permitting Detective Crum to testify that the photograph, State's Exhibit 39A, shown to Kelley, was a photograph of Cummings or at least whom Detective Crum believed to be Cummings. On appeal, Cummings alleges the trial court erred in allowing Detective Crum's testimony because it was "opinion based on facts that the jury was just as capable as the witnesses to evaluate, therefore Crum's testimony invaded the province of the jury; and, Crum's belief was inadmissible inferential hearsay[.]"

### Standard of Review

A trial court enjoys wide discretion in admitting the testimony of a lay witness into evidence. *State v. Winston,* 959 S.W.2d 874, 877 (Mo.App. E.D.1997). We review a trial court's admission of the testimony of a lay witness for an abuse of the court's discretion. *State v. Jefferson,* 341 S.W.3d 690, 696–97 (Mo.App. S.D. 2011). " 'Discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.' " *Id.* (quoting *State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006)). On direct appeal, we review " 'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.' " *Id.* (quoting *Forrest,* 183 S.W.3d at 223–24). "An error is not prejudicial if there is no reasonable probability that it affected the outcome of the trial." *State v. Nash,* 339 S.W.3d 500, 515 (Mo. banc 2011).

### Analysis

It is apparent from the questions asked Detective Crum that his testimony about the photograph was not offered as opinion testimony or to prove the truth of the matter asserted—that the individual in the photograph was Cummings. Rather, the testimony was elicited to explain Detective Crum's subsequent conduct. " 'An out-of-court statement offered not for the truth of the matter asserted, but to explain subsequent police conduct, is not hearsay and is therefore, admissible assuming it is relevant.' " *State v. Allison,* 326 S.W.3d 81, 90 (Mo.App. W.D.2010) (quoting *State v. Douglas,* 131 S.W.3d 818, 824 (Mo.App. W.D.2004)). "It is well established that … testimony is admissible to explain the officers' conduct, supplying relevant background and continuity to the action." *State v. Brooks,* 618 S.W.2d 22, 25 (Mo. banc 1981). It is when such out-of-court statements go beyond what is necessary to explain subsequent police con-

duct that they become hearsay. *Allison,* 326 S.W.3d at 90.

 Here, Detective Crum's testimony was sought to explain his conduct in obtaining an arrest warrant for Cummings. He testified obtaining the photograph in question was part of his investigation, he showed that photograph to Kelley, and she indicated the person in the photograph was the shooter. Detective Crum further testified that Kelley's identification was used to obtain an arrest warrant for Cummings, which allowed the police to obtain a booking photograph to use in the lineups for the other witnesses. Simply put, Detective Crum's testimony provided the jury with an explanation for Detective Crum's investigation and why his efforts focused on Cummings as the likely shooter. *See Hardy v. State,* 387 S.W.3d 394, 400 (Mo. App. S.D.2012).

Cummings relies primarily on *State v. Presberry,* 128 S.W.3d 80 (Mo.App. E.D. 2003). In that case, two people were robbed, but neither was sure of the identity of the robber. *Id.* at 87. A surveillance tape of the robbery and still photographs from the surveillance tape were shown at trial. *Id.* at 88. Two police officers who had reviewed a surveillance tape from the robbers testified the defendant was the man in the tape. *Id.* at 89. The court concluded it was plain error to allow the police officers' identification testimony because the identity of the perpetrator was difficult to determine from the tape and photographs, and neither officer had any prior familiarity with the defendant. Their identification was based solely on the review of the evidence that was equally available to the jurors. *Id.* The court concluded such testimony invaded the province of the jury and was prejudicial in that there was no other identification evidence linking the defendant to the crime. *Id.* at 90.

As our discussion of Detective Crum's testimony above reveals, *Presberry* is distinguishable from this case because unlike the officers in *Presberry,* Detective Crum was not asked to offer an opinion that Cummings was the individual in the photograph. Rather, he was simply asked whether he obtained a photograph he believed depicted Cummings for a witness to identify Cummings in order to explain his investigation leading to the issuance of an arrest warrant.

 Even if Detective Crum's testimony that he believed the individual in the photograph was Cummings was inadmissible, Cummings has failed to show prejudice from the admission of Detective Crum's testimony that affected the outcome of the trial. *See Nash,* 339 S.W.3d at 515. The photograph at issue, State's Exhibit 39A, was admitted into evidence and seen by the jury during witness Kelley's testimony, which was *prior to* Detective Crum's testimony. Kelley testified that Detective Crum showed her State's Exhibit 39A, and the shooter was depicted in the photograph. Before Detective Crum even took the witness stand, the jury had the opportunity to review the photo and form its own opinion as to whether Cummings was the person depicted in the photograph.

Finally, as previously discussed, there was plenty of additional evidence besides Detective Crum's testimony that he obtained a photograph he believed to be Cummings, to support a conviction. There was multiple in-court and out-of-court identification of Cummings as the shooter by witnesses, on which the jury could have relied in reaching its verdict.

For all of the above reasons, we find the trial court did not abuse its discretion in permitting Detective Crum to testify that the photograph he showed Kelley was a photograph of Cummings or someone De-

tective Crum believed to be Cummings. Cummings' Point II is denied.

Accordingly, the trial court's decision is affirmed.

GARY W. LYNCH, P.J., and NANCY STEFFEN RAHMEYER, J., Concurs.